Shaun STANISTREET, Plaintiff,

v.

Shirley CHATER, Commissioner of the
Social Security Administration [1],
Defendant.

No. CV 94–4461(JG).

United States District Court,
C.D. California.

Oct. 13, 1995.

---

1. Pursuant to P.L. No. 103–296, the functions of the Secretary of Health and Human Services in actions brought under the Social Security Act were transferred to the Commissioner of the Social Security Administration (Commissioner) effective March 31, 1995. Section 106(d) of P.L. 103–296 provides that the court may, on its own motion, substitute the Commissioner as defendant in such actions, the continuation of which shall not be affected by such constitution.

Lawrence D. Rohlfing, Lawrence D. Rohlfing Law Offices, Santa Fe Springs, CA, Edmund Parent, Santa Barbara, CA, for Plaintiff.

Leon W. Weidman, Kristine Blackwood, AUSA, Office of U.S. Attorney, Civil Div., Los Angeles, CA, for Defendant.

## ORDER

GROH, United States Magistrate Judge.

Plaintiff has filed a complaint under 42 U.S.C. § 405(g) seeking review of the Commissioner's denial of disability and supplemental security income (SSI) benefits. Defendant has answered, and the parties have filed cross motions for summary judgment. For the reasons discussed below, I conclude that the Commissioner applied the proper legal standards and that the denial of benefits is supported by substantial evidence.

## BACKGROUND

■ On April 27, 1992, plaintiff applied for social security disability benefits and SSI, claiming disability due fibromyalgia[2], head-

**2.** According to medical literature offered into evidence by plaintiff, fibromyalgia (also known as fibrositis or myofascial pain syndrome) is a "pain magnification syndrome whose essential features are a complaint of generalized aching and the presence of classic tender points." (Administrative Record (A.R.) 220). Although characterized as a "rheumatic disease," fibromyalgia "remains poorly understood, is still not considered a disease even by many clinicians, and may

not qualify for Social Security Administration disability benefits." (A.R.209).

More specifically, fibromyalgia is defined as either (1) pain in muscles and fibrous connective tissue, or (2) one of a group of nonarticular (not affecting joints) rheumatic diseases characterized by dull and persistent pain, tenderness, and stiffness of muscles, regions where tendons are inserted into bones, and nearby soft issues. The latter symptoms can be due to overuse of mus-

aches, memory loss, and "post-trauma head." (Administrative Record (A.R.) 66–73). Plaintiff alleged a disability onset date of February 20, 1991.[3] (A.R.66, 70). After plaintiff's claim was rejected, both initially and upon reconsideration, a hearing was held before a Administrative Law Judge (ALJ) on October 4, 1993. (A.R.11).

The ALJ concluded that plaintiff has the condition diagnosed as fibromyalgia, qualified by a finding of no abnormal bone scan, swelling, restriction of motion, spasm, atrophy, or "other clinical evidence of restrictive pain." (A.R.16). The ALJ found no mental impairment and concluded that plaintiff maintains good concentration despite allegations of headaches, which he determined not to have "medical basis." (A.R.16). The ALJ concluded at step four of the sequential evaluation process[4] that plaintiff could not perform his past relevant work as a delivery truck driver because it required a medium to heavy level of exertion.[5] (A.R.16) He determined, however, that plaintiff retains the residual functional capacity to perform light, unskilled exertional activities.

Proceeding to step five, the ALJ applied "the grids" (Appendix 2 of Subpart P, 20 C.F.R. Part 404), to determine whether plaintiff should be deemed disabled. 20 C.F.R. § 416.969. Based on his finding that plaintiff could do light work, the ALJ applied Table No. 2 of the grids. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, §§ 202.00, *et. seq.* He found that plaintiff's age, education and work experience matched the criteria described at rules 202.20 and 202.21 of Table No. 2, and consequently concluded that plaintiff is "not disabled."[6] (A.R.16, 17). The Appeals Council denied plaintiff's request for review. (A.R.4).

cles or be secondary to another, underlying disorder. Causes of fibromyalgia are physical and/or mental stress; restless or inadequate sleep; exposure to cold, especially cold dampness; a rheumatic disease; Lyme disease or other virus infection; psychogenic or psyohosomatic factors. 2 Schmidt's *Attorneys' Dictionary of Medicine* at 55, 56 (1995 & Feb. 1995 Supp.).

3. It appears that plaintiff filed a previous disability application alleging an onset date of November 6, 1985. (A.R.65, 66). It further appears that plaintiff's initial application was denied on reconsideration in February 1987.. (A.R.65). The record does not, however, include copies of the relevant documents nor does it clearly indicate the date of denial. (A.R.65). Although the record before the court does not disclose any information about the nature of the claim, it is noted that Dr. Slutzker's initial attendance upon plaintiff (for treatment of a work-related injury, as discussed at p. 1132 and note 13, *infra*) roughly coincides with the date of the previous claim. (A.R.176–182).

The court notes as a point of interest that a prior determination that a claimant was not disabled as of a given date raises a presumption of continuing non-disability, which can be overcome only by a demonstration of a change in the claimant's condition after that date. *Lyle v. Secretary of Health and Human Services,* 700 F.2d 566, 568, (9th Cir.1983); *see also, Taylor v. Heckler,* 765 F.2d 872, 875 (9th Cir.1985).

4. The regulations prescribe a five-step, sequential procedure. *20 C.F.R. § 416.20.* Briefly summarized, to determine disability:

[t]he following steps are addressed in order. (1) Is the claimant presently unemployed? (2) Is the claimant's impairment 'severe'? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Garfield v. Schweiker,* 732 F.2d 605, 607 n. 2 (7th Cir.1984). See also *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir.1991).

5. The Secretary's guidelines for measuring "physical exertional requirements" are set forth at 20 C.F.R. § 416.967.

6. Section 202.20 directs a finding of "not disabled" for claimants whose age, education and previous work experience meet the following criteria:

(1) claimant is a "younger individual;" meaning that he or she is under the age of 50 (20 C.F.R. § 416.963(b));

(2) claimant has a high school education or above (20 C.F.R. § 416.964(b)(4));

(3) claimant's previous work experience is considered unskilled or claimant has no previous work experience (20 C.F.R. § 416.965).

Section 202.21 directs a finding of "not disabled" for younger individuals with a high school education or above whose previous work experience is considered skilled or semi-skilled but with non-transferable skills. 20 C.F.R. §§ 416.963(b), 416.964(b)(4), 416.965.

## RELEVANT RECORD EVIDENCE

Plaintiff is a 38 year-old man who obtained a high school equivalency certificate, attended community college and received vocational training as a truck driver. (A.R.31, 93). He has worked as a delivery truck driver, shipping clerk, packer, electronic assembler, security guard, and cashier. (A.R.93, 98, 99, 100, 162).

In approximately 1977,[7] plaintiff was injured in a motorcycle accident and underwent surgery to relieve fluid pressure in the brain, a procedure from which he recovered. (A.R.31–32). In late 1985, while employed as a packer for a manufacturing company, plaintiff sustained three separate injuries to his back and neck. (A.R. 32–36). Plaintiff sought treatment for pain resulting from his injuries (A.R.37, 38) and eventually received diagnoses of cervical strain and fibrositis[8] (A.R.36, 174, 182) which qualified him for a period of state disability benefits. (A.R.36, 140). Plaintiff returned to full-time work as a delivery truck driver in October 1987 and remained so employed for about three years[9] . (A.R.40–43). In September 1990, plaintiff resigned from his job as a delivery person and thereafter worked in sales, on a boat and drove a cab. (A.R.43–44). He left his last position in about February 1991, allegedly due to pain and other symptoms of fibrositis. (A.R.44–45).

In January 1991, plaintiff was evaluated by an orthopedist, Dr. Thomas,[10] who diagnosed cervical and lumbar strain. (A.R.140–143). Dr. Thomas reported plaintiff's subjective complaints of pain and numbness dating from his 1985 injuries. (A.R.140, 142). He also noted that plaintiff stated that he "may have received treatment" for his neck and back twice since 1987, most recently in September 1990. (A.R.140). Dr. Thomas prescribed further tests, physical therapy, a lumbar pillow, and medication. (A.R.143).

In a letter dated March 12, 1991, the physical therapist to whom Dr. Thomas referred plaintiff characterized plaintiff's pain complaints as "puzzling" and described him as a "perplexing client." (A.R.189, 190). She observed that he seemed to have "good" and "bad" days for no apparent reason and that she could not find consistent mechanical aggravating factors for his symptoms, other than sitting. (A.R.189). Her physical examination showed "inconclusive results" and therapeutic exercise produced "mixed" results. (A.R.189). She noted plaintiff's family's concerns about plaintiff's depression, but also reported that he seemed quite motivated to comply with physical therapy. (A.R.190).

When plaintiff returned to Dr. Thomas in March 1991 and reported no improvement, Dr. Thomas referred him to Dr. Hoos, a rheumatologist. (A.R.139). Dr. Hoos' initial examination in March 1991 produced, *inter alia*, the following findings: (1) full range of motion of shoulders, elbows, and wrists; (2) normal grip strength and no decrease of strength in the biceps and triceps; (3) "slightly below normal" expansion of the lumbar spine; (4) full range of motion in the hips and knees; (5) normal deep tendon reflexes. (A.R.231–232). He found no evidence of inflammatory joint or muscle diseases. (A.R. 232). Dr. Hoos' impression was fibrositis or myofascial syndrome[11] with a history of periarticular (joint) tenderness, depression and some sleep disturbance. (A.R.232). He prescribed exercise and amitriptyline (A.R.232, 148), an anti-depressant with sedative effects used to help improve sleep. *See Physicians' Desk Reference* at 2441 (1995); 2 Schmidt's

---

7. The date of plaintiff's accident is reported variously as 1976 (A.R.162, 165), 1977 (A.R.31), and 1978 (A.R.180, 230).

8. Fibrositis is another term for fibromyalgia. *See* note 2, *supra; see also*, 2 Schmidt's *Attorneys' Dictionary of Medicine* at 56, F–74 (1995 & Feb. 1995 Supp.)

9. Plaintiff testified that the two jobs he held during this time entailed driving a delivery truck, helping on the packaging conveyer belt line, getting orders ready for delivery, loading and unloading trucks, operating the forklift and pallet jerks, and lifting boxes ranging in weight from 20 to 50 pounds. (A.R.41–42).

10. Plaintiff apparently consulted Dr. Thomas in connection with a workers' compensation claim. (A.R.139, 140).

11. Myofascial syndrome describes a condition very similar to fibromyalgia and fibrositis. *See* notes 2 and 8, *supra; see also*, 2 Schmidt's *Attorneys' Dictionary of Medicine* at M–323 (1995 Ed.).

*Attorneys' Dictionary of Medicine* at 56 (1995 & Feb. 1995 Supp.).

At a follow-up exam with Dr. Hoos in April 1991, plaintiff reported playing golf, walking and increasing his activity level while on the prescribed medication. (A.R.148). In August 1991, however, plaintiff complained of muscle spasms and reported that he had not seen much improvement on the same medication. (A.R.146). On both occasions, Dr. Hoos noted plaintiff's continuing complaints of pain and tenderness, but found no evidence of muscle or joint swelling, redness, or warmth. (A.R.146, 148). By November 1991, plaintiff told Dr. Hoos that he was doing much better on a different medication and felt he was able to hold a full-time job. (A.R.145). Dr. Hoos released plaintiff to return to work but prohibited him from prolonged lifting, carrying over 20 pounds, and repeated bending over a two-hour period. (A.R.145).

The record reveals that plaintiff sought no further treatment for nearly a year, until he consulted Dr. Clements, chief of rheumatology at UCLA Medical Center, in March 1992. (A.R.54, 60, 157). He found plaintiff to have the "classic tender points" of fibromyalgia but indicated that range of motion, motor strength, sensory responses and gait were normal or intact. (A.R.158). He prescribed Parafon Forte, which is indicated for the relief of muscle spasms and pain associated with acute musculoskeletal conditions. *Physicians' Desk Reference* at 1471 (49th ed.1995).

After seeing plaintiff for two follow-up appointments, Dr. Clements signed an assessment form in July 1992 stating that plaintiff had no impairment-related physical limitations. (A.R.153.155, 156). Plaintiff returned to UCLA later that month and was examined by Dr. Schwartz. (A.R.152). According to her notes and plaintiff's testimony, plaintiff asked Dr. Schwartz to fill out papers for permanent disability but refused to allow her to examine him, becoming "very defensive and hostile." [12] (A.R.54–55, 64, 152). She conferred with Dr. Clements, who was unwilling to give an opinion of permanent dis-

ability based on his current diagnosis. (A.R.55, 152). Dr. Schwartz relayed this information to plaintiff and suggested he undergo a psychiatric evaluation, whereupon plaintiff became "very belligerent." (A.R 64, 152). Dr. Schwartz noted that plaintiff would not be seen again at the UCLA clinic until he had written proof of such an evaluation. (A.R.152).

Plaintiff did receive a consultative psychological evaluation from John Schoenherr, Ph. D., in March 1993. (A.R.161). Dr. Schoenherr observed that plaintiff's muscle spasms interfered with his test performance and delayed his response times. (A.R.161) However, he found no impairment in thought process, memory, orientation, or visual-motor integration. (A.R.162). Plaintiff's affect was observed to be "somewhat flat for someone in such pain." (A.R.162). His I.Q. was within the average range, with a "somewhat low" memory index score relative to his I.Q. (A.R.163). Dr. Schoenherr concluded that plaintiff exhibited "some impairment of mental functioning, especially in tasks done under time pressure" (A.R.163) but made no other diagnosis of mental impairment. He also found that plaintiff (1) could relate to supervisors, co-workers, and the public; (2) understand, remember and carry out detailed but uncomplicated job instructions, given enough time; and (3) maintain fairly good concentration and attention. (A.R.164). Dr. Schoenherr believed plaintiff to be physically impaired, but also commented that "fibromyalgia is as much of a medical enigma as the so-called Chronic Fatigue Syndrome." (A.R.163).

At the Commissioner's request, plaintiff underwent an internal medicine examination by Dr. Siciarz in March 1993. Dr. Siciarz recorded plaintiff's complaints of headaches, neck and chest pain, and generalized body pains. He noted that plaintiff had not had his headaches evaluated since his initial hospital admission in 1976 and had not obtained medical help for an episode of severe chest pain in 1987. (A.R.165). He observed that plaintiff "demonstrated pain" throughout the

---

12. Plaintiff testified that he did not allow Dr. Schwartz to examine him because Dr. Clements had "pinched on something" in his spine during his last examination and had "aggravated his condition" such that he was still in pain and did not want an unknown doctor to examine him. (A.R.55).

range of motion testing but exhibited good mobility and no significant limitation. Both his medical and neurological exams were otherwise normal. (A.R.168). Dr. Siciarz stated that plaintiff's headaches "may reflect chronic post-traumatic headaches" and that plaintiff's reported chest pain "is atypical and not likely to represent angina." (A.R.168).

Plaintiff's orthopedist, Dr. Slutzker, submitted a one-page report dated April 1, 1993 (A.R.191), and a "Work–Related Activities (Physical)" assessment form which bears two dates: April 1, 1993 and October 27, 1993. Dr. Slutzker's April 1993 report states that plaintiff "is being treated for fibromyalgia at this time." He opines that plaintiff "cannot stand, walk, sit or use his hands and arms for more than ten or fifteen minutes without it causing pain which interferes with his ability to work." He relates that he first diagnosed plaintiff with fibrositis in March 1986 and "confirmed" that diagnosis with a diagnosis fibromyalgia on March 3, 1993. He reports that plaintiff "has had this condition for over seven years and it is worse," and concludes that plaintiff is "permanently partially disabled as of March 3, 1993." (A.R.191). It is noted that there are no examination or treatment records from Dr. Slutzker for 1993; indeed, there are no treatment notes, clinical findings, reports or test results whatsoever from Dr. Slutzker after March 31, 1986.[13]

On the assessment form, Dr. Slutzker indicated that plaintiff cannot stand or walk for more than two hours nor sit for more than one hour in an eight-hour workday. He found that plaintiff can lift up to 20 lbs. frequently and 50 lbs. occasionally; carry up to 5 lbs. frequently and up to 20 lbs. occasionally; and can occasionally bend, squat, crawl, climb and reach. He also indicated that plaintiff cannot use his hands or feet for repetitive grasping, pushing, pulling, or fine manipulation. He assessed a "moderate" re-

striction on driving automotive equipment. (A.R.236).

At the hearing, plaintiff testified that he experienced aches and pains lasting from seconds to weeks or months in many different parts of his body. (A.R.45–48, 56–57). He described the pain variously as "sharp," "numbing," "aching," "radiating," "knotting," "stabbing," "popping," "crackling," "cramping," and "flaring." (A.R.45–47, 57). Plaintiff rated his back pain as 6 or 7 on a scale of ten (1 being "mild" and 10 being "most excruciating"), with other pains ranging between 4 and 5 or 1 and 2. (A.R.57). When the ALJ asked if the pain in different areas were similar, he replied, "It's similar and varies." (A.R.47).

Plaintiff described intermittent difficulties using his hands, kneeling, bending, concentrating, and following instructions. (A.R.45–46, 50). He testified that he could walk for variable periods up to 25 minutes, stand for up to 10 minutes, and sit for unspecified periods. (A.R.47–48). He related pain-based limitations in performing household chores. (A.R.51, 52, 53, 57).

In response to a question from the ALJ about his "current medications," plaintiff said he took Naprosyn, Parafon Forte and another medication, but not on a daily basis.[14] He also said he took an Advil almost every day, used hot or cold packs to relieve his symptoms "maybe only once or twice a week" (A.R.49, 50), and was wearing a lumbosacral brace or corset (A.R.53) at the hearing. He testified that his condition had worsened since 1989 or 1990. (A.R.42, 45). The ALJ inquired whether his condition had worsened in the three or four months prior to the hearing, he stated that it was hard to make a comparison because the pains were constantly changing. (A.R.50–51).

---

**13.** The record includes three reports from Dr. Slutzker dated December 1985, January 1986, and March 1986 (A.R.176–182). These reports concern plaintiff's visits to Dr. Slutzker after his work-related injuries in October 1985. (Inasmuch as the reports are addressed to attorneys, it appears that plaintiff consulted Dr. Slutzker incident to his workers' compensation claim.) Because plaintiff alleged an onset disability date of February 20, 1991, and, moreover, has conceded

that the ALJ properly evaluated the medical evidence and testimony related to plaintiff's condition prior to March 3, 1993 (A.R. 66; Pl. Mem. at p. 4), these reports will not be discussed here. *But see* note 3, *supra.*

**14.** The record does not include a standardized medications form showing current prescription information.

In terms of a mental impairment, plaintiff testified that he had been referred to a psychiatrist and psychologist but not for "treatment or anything like that." (A.R.51). When the ALJ asked if he ever had mood swings, plaintiff said it was a "possibility ... when the first injury occurred or whatever." (A.R.52).

## DISCUSSION

■ Under 42 U.S.C. § 405(g), the Commissioner's decision is subject to review to determine whether: (1) the findings are supported by substantial evidence and (2) the Commissioner applied the proper legal standards. *Swanson v. Secretary of Health and Human Services,* 763 F.2d 1061, 1064 (9th Cir.1985). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)).

In the instant case, plaintiff challenges only one aspect of the ALJ's decision-making process. He concedes that the ALJ "appropriately adjudicated whether [plaintiff] was disabled [up] to the date of March 3, 1493." Plaintiff contends, however, that the ALJ improperly rejected the "uncontroverted" opinion of plaintiff's physician, Dr. Slutzker, as to plaintiff's disability on and after a new onset date of March 3, 1993.[15] (Pl.Mem. at p. 4). For the reasons discussed below, I find plaintiff's argument to be without merit.

### 1. *Treating Physician's Opinion*

■ While a treating physician's opinion is normally entitled to great weight, it is not necessarily conclusive as to either a physical condition or the ultimate issue of disability. *Rodriguez v. Bowen,* 876 F.2d 759, 761–62 &

n. 7 (9th Cir.1989) *see also* 20 C.F.R. §§ 416.927(d)(2) and 416.927(e). To reject the uncontroverted opinion of a claimant's physician, the ALJ must articulate "clear and convincing" reasons. *Magallanes v. Bowen,* 881 F.2d 747, 752 (9th Cir.1989). If, however, the treating physician's opinion conflicts with that of an examining physician, the ALJ need only set forth "specific, legitimate" reasons for rejecting that opinion, based upon substantial evidence in the record. *Id.* at 751 (citing *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir.1987)).

Plaintiff complains that the ALJ improperly rejected Dr. Slutzker's opinion that the severity of plaintiff's disability precludes both light and sedentary work.[16] (Pl.Mem. at p. 5). Plaintiff argues that Dr. Slutzker's opinion was uncontroverted with respect to the issue of disability after March 3, 1993 (the date as of which he declared plaintiff disabled), because there are no conflicting medical opinions in the record on or after that date. (Pl.Mem. at pp. 5–6). This argument is in error on two counts.

First, Dr. Siciarz' report is dated March 23, 1993. He examined plaintiff and found no significant limitation, good mobility, and normal neurological results. (A.R.168). Second, plaintiff acknowledges that the record does contain conflicting medical opinions from at least three physicians prior to March 1993 and admits, moreover, that these "past medical findings" provide substantial evidence for the Commissioner's disability determination concerning the period from February 20, 1991 to March 3, 1993. (Pl.Mem. at pp. 4, 6). Having waived objection to the ALJ's findings as they pertain to this period, plaintiff seems to think he is entitled to a clean slate commencing on March 3, 1993. He would have the court ignore everything in the record prior to that date without any

---

**15.** Plaintiff advances a novel (and unconvincing) theory: by arbitrarily selecting a new onset date, a party is permitted to ignore everything in the record prior to that date. Conveniently, Dr. Slutzker's report and assessment form are the last medical reports in the record and can therefore be characterized as "uncontroverted." As discussed below, this contention is untenable. Among other things, plaintiff has adduced absolutely no evidence of a medically determinable event or change in condition justifying the revised onset date. Moreover, there is no evidence

that plaintiff's "new" condition could be expected to last more than twelve months.

**16.** Plaintiff does not dispute the ALJ's determination with respect to plaintiff's credibility, but nevertheless cites plaintiff's testimony in support of his contention that the ALJ improperly disregarded Dr. Slutzker's opinion. (Pl.Mem. at p. 5, 1n. 14). Since the ALJ found plaintiff's testimony concerning his limitations to be not credible, a finding which plaintiff does not contest, this aspect of plaintiff's argument carries no weight.

argument as to its probative value concerning plaintiff's condition after March 3, 1993. This the court cannot do.

 As a matter of law, a reviewing court must examine the administrative record as a whole, weighing both the evidence that supports and detracts from the Commissioner's decision. *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir.1990). Accordingly, plaintiff cannot foreclose scrutiny of legitimate record evidence he deems unfavorable to his cause. The admittedly conflicting medical evidence is a part of the record; hence, Dr. Slutzker's opinion is not "uncontroverted" and the conflicting medical opinions must be evaluated. Plaintiff is nevertheless entitled to advance arguments about the weight or probative value of such evidence. Plaintiff has not, however, made any attempt to do so. Instead, he completely ignores the contemporaneous opinion of Dr. Siciarz and baldly asserts that the opinions of Drs. Thomas, Hoos, and Clements are "outdated" simply because they predate March 3, 1993. (Pl.Mem. at p. 6). It does not logically follow that because the past medical findings provide substantial evidence for the ALJ's determination for the period before March 3, 1993, they cannot and do not provide substantial evidence for findings concerning a subsequent period. Furthermore, the absence of medical treatment between July 1992 (the date plaintiff consulted Dr. Clements' colleague, Dr. Schwartz), and March 1993 suggests that plaintiff's subjective complaints of worsening symptoms and chronic, disabling pain are exaggerated. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (unexplained failure to seek treatment can cast doubt on the sincerity of a plaintiff's pain testimony). Given the conflicting medical opinions in the record, the ALJ was required to make specific, legitimate findings justifying his rejection of Dr. Slutzker's opinion. I conclude that the ALJ fulfilled this requirement.

First, the ALJ found that the report was a "disability claim accommodation" which was entitled to no weight on the issue of whether plaintiff is disabled under the applicable legal standards for social security disability benefits. (A.R.13). The ALJ noted that Dr. Slutzker described plaintiff as "partially disabled as of March 3, 1993." This phrase is not defined by Dr. Slutzker nor does it correspond to the terminology or definitions set forth in the statutes and regulations governing the award of SSI benefits.[17] Moreover, as discussed above, there is no evidence explaining or supporting the designation of this particular date as the new onset date, nor does it appear that Dr. Slutzker even examined plaintiff on that date.

Contrary to plaintiff's assertions, the ALJ was not obliged to accept as gospel Dr. Slutzker's opinion on the ultimate issue of disability. The determination that a claimant meets the statutory definition of disability is a legal conclusion and is reserved to the Commissioner. 20 C.F.R. § 416.927(e). A number of factors may be considered in deciding the weight to be accorded a medical opinion in making the disability determination. *See* 20 C.F.R. § 416.927(d). Among those properly considered by the ALJ were (1) the supportability and consistency of Dr. Slutzker's opinion, and (2) the treatment relationship between Dr. Slutzker and plaintiff. 20 C.F.R. §§ 416.927(d)(2), (3) and (4).

 The ALJ found that Dr. Slutzker's April 1993 report was conclusory and was not supported by clinical findings, a valid reason for discounting a medical opinion. *Matney, On Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir.1992). Dr. Slutzker's opinion of April 1993 is devoid of clinical findings. In fact, there is no evidence that Dr. Slutzker even examined plaintiff in conjunction with this report. The last treatment notes from Dr. Slutzker in the record are dated March 31, 1986, seven years earlier.[18]

---

**17.** Because Dr. Slutzker's earlier attendance upon plaintiff appears to have been related to a workers' compensation claim (*see* note 13, *supra*), it is possible that this terminology corresponds to that used under the applicable state statutes. A determination of disability by a state agency is not binding on the Commissioner, even when the state standards are more rigorous than those used to determine disability under the Social Security Act. *Bates v. Sullivan*, 894 F.2d

1059, 1063 (9th Cir.1990). Thus, even if it were established that Dr. Slutzker's opinion comported with the standards applicable to workers' compensation claims, the ALJ is not bound to follow such an opinion. *See also*, 20 C.F.R. § 416.927(e).

**18.** *See* discussion at pp. 1133–34 and note 13, *supra*.

The work assessment form adds nothing to the record in this regard, as it, too, merely reflects Dr. Slutzker's conclusions.

The ALJ also found that Dr. Slutzker's conclusions concerning plaintiff's exertional limitations were inconsistent with other medical evidence in the record. (A.R.13). It is not necessary to belabor the relevant record evidence on this point, inasmuch as plaintiff has already acknowledged that Drs. Thomas, Hoos and Clements all diagnosed "non-disability" before March 3, 1993. (Pl.Mem. at p. 6). In addition, Dr. Siciarz' March 1993 opinion contradicts Dr. Slutzker's report of even date. Significantly, each of these physicians conducted examinations and tests, made clinical findings and (with the exception of Dr. Siciarz) saw plaintiff on multiple visits during a course of treatment. In other words, all of these physicians may appropriately be considered "treating physicians" whose opinions are supported by clinical findings. *See* 20 C.F.R. § 404.1527(d). As such, their opinions are entitled to special weight and constitute substantial evidence supporting the ALJ's rejection of Dr. Slutzker's conflicting opinion. *Magallanes,* 881 F.2d at 751, 752.

■ Plaintiff asserts that because the opinions of Drs. Thomas, Hoos, and Clements pre-date Dr. Slutzker's opinion and because plaintiff's condition has allegedly worsened in the interim before March 3, 1993, the conflicting medical opinions may be disregarded in their entirety. There is no rational basis for this assertion. First, plaintiff ignores the opinion of Dr. Siciarz, whose findings were in the normal range and who made no medical diagnosis. (A.R.165–171). Second, plaintiff has not demonstrated why the extensive reports and findings of Drs. Thomas, Hoos, and Clements concerning plaintiff's fibrositis/fibromyalgia in 1991 and 1992 should be deemed completely irrelevant to an analysis of his fibromyalgia in March 1993. Plaintiff cites *Magallanes* for the proposition that medical reports from an early phase of the disease are likely to be less probative than later reports. (Pl. Reply Mem. at p. 3–4). However, plaintiff makes no attempt to apply this very general principle to the facts of this case. For one thing, it is not self-evident that reports from as late as March and July 1992 pertain to an "early phase" of plaintiff's disease, alleged to have been diagnosed in March 1986. (A.R.191).

Furthermore, although Dr. Slutzker asserts that plaintiff's condition has worsened, he does not cite any supporting data. To the contrary, the work activities assessment form he completed indicates that plaintiff's condition was "permanent and stationary" in April 1993 and again in October 1993, belying plaintiff's claim of progressive deterioration. Even if it were established that plaintiff's condition had deteriorated, this alone would not justify ignoring earlier medical reports pertaining to the same condition.

■ Two additional factors not specifically considered by the ALJ provide further evidence supporting his rejection of Dr. Slutzker's opinion: the history of the treatment relationship between Dr. Slutzker and plaintiff, and Dr. Slutzker's field of specialization. *See* 20 C.F.R. §§ 416.927(d)(1), (d)(2), and (d)(5). Because there is no evidence that Dr. Slutzker had seen or examined plaintiff between March 31, 1986, and April 1993, he does not appear to be a bona fide "treating physician." Deference is given a treating physician's opinion because he has a greater opportunity to know and observe the patient as an individual, *Magallanes,* 881 F.2d at 751, and is most able to develop a detailed, longitudinal picture of the patient's medical impairments. 20 C.F.R. § 404.1527(d)(2). The length of the treatment relationship, frequency of examination, and the nature and extent of the treatment relationship are all considered in determining whether a physician's opinion is entitled to such deference. *Id.*

In this case, the absence of any evidence that Dr. Slutzker had examined or treated plaintiff for seven years before he pronounced him disabled suggests that he did not have any special or detailed knowledge of plaintiff's condition in March 1993. This conclusion is fortified by record evidence showing that plaintiff's alleged condition, fibromyalgia, is rheumatic in nature. (A.R.209). Dr. Slutzker is an orthopedist, not a rheumatologist. However, Dr. Hoos (to whom plaintiff was referred by another orthopedist, Dr. Thomas) and Dr. Clements were both rheumatologists, and neither of them found plain-

tiff to be disabled. (A.R.145–150, 152–158, 230–232). Thus, Dr. Slutzker appears to have rendered an opinion outside his area of specialization, based on a treatment relationship which existed, if at all, seven years earlier. When these factors are considered in conjunction with the findings made by the ALJ, it is manifest that the Commissioner's decision must be affirmed.

For all of the above reasons, I conclude that the ALJ set forth specific, legitimate reasons for rejecting the opinion of Dr. Slutzker and that those reasons are supported by substantial evidence.

## CONCLUSION

Based on the foregoing, I conclude that the ALJ did not commit any legal error, and that his determinations are supported by substantial evidence. The Commissioner's motion for summary judgment is therefore GRANTED, and the complaint is dismissed.