**Sharon ALEXANDER, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.**

No. 02–C–877.

United States District Court, E.D. Wisconsin.

Sept. 30, 2003.

---

David G. Dries, Milwaukee, WI, for Plaintiff.

Mora Sheehan Barry, Milwaukee, WI, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Sharon Alexander ("plaintiff") brought this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of defendant Jo Anne Barnhart, Commissioner of the Social Security Administration ("defendant or the Commissioner"), denying her application for disability benefits under the Social Security Act. The action was assigned to Magistrate Judge Patricia J. Gorence for pretrial proceedings. However, the parties did not

consent to the exercise of jurisdiction by the magistrate judge. Accordingly, Judge Gorence could only make a recommendation on plaintiff's appeal.

On July 23, 2003, Judge Gorence issued a recommendation that the Commissioner's decision be reversed and the matter be remanded for further proceedings pursuant to § 405(g), sentence four. The Commissioner objects to the recommendation, and the matter is now before me for decision.[1]

### I. DISABILITY STANDARD

In order to obtain benefits under the Social Security Act, plaintiff must be disabled, that is, she must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Social Security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. See 20 C.F.R. §§ 404.1520; 416.920. Under this test, the Commissioner must determine: (1) whether the claimant is presently unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether any of the claimant's impairments are listed by the Social Security Administration as being so severe as to preclude substantial gainful activity;[2] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform her past work; and (5) if not, whether the claimant is able to perform any other work

---

1. Believing that there were no objections, I adopted the recommendation on August 7, 2003. However, I subsequently vacated that order upon receiving the Commissioner's objections.

2. These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings").

in the national economy in light of her age, education and work experience. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.2000); *Rucker v. Chater,* 92 F.3d 492, 494 (7th Cir.1996).

▮ The claimant will automatically be found disabled if she makes the requisite showing at steps one through three. *See Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 512 n. 3 (7th Cir.1999). If the claimant is unable to satisfy step three, she must then demonstrate that she lacks the RFC to perform her past work. *Id.* If she makes this showing, the burden shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. *Id.* The Commissioner may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of her limitations, or through the use of the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2. *See Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The Grid is a chart that classifies a person as disabled or not disabled based on her physical ability, age, education, and work experience. *See Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987); *see also*

*Heckler,* 461 U.S. at 461–62, 103 S.Ct. 1952; *Caldarulo v. Bowen,* 857 F.2d 410, 413 (7th Cir.1988).

However, the Commissioner may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule, *see Caldarulo,* 857 F.2d at 413, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments) might substantially reduce the claimant's range of work, *see Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001) (citing *Luna v. Shalala,* 22 F.3d 687, 691 (7th Cir.1994)). In such a case, the Commissioner must solicit the testimony of a VE, *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir.1994), although she may use the Grid as a "framework" for making a decision, *see* 20 C.F.R. § 404, Subpt. P, App. 2, § 200.00(e)(2).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application

Plaintiff applied for benefits on September 16, 1998,[3] alleging that she was disabled due to fibromyalgia[4] and seizures. (Tr. at 69.) Her application was denied initially and on reconsideration. (Tr. at 37–38.) Plaintiff then requested and was granted a hearing before an Administra-

---

3. The record reveals that plaintiff previously applied for benefits in August 1997 and February 1998. She was denied both times but did not request a hearing.

4. Fibromyalgia is "a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features." *See* Frederick Wolfe et al., "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee," 33 *Arthritis and Rheumatism* 160 (1990); Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, *Current Medical Diagnosis & Treatment 1995* 708–09 (1995). Its cause or causes are unknown, there is no cure, and, of greatest importance to disability

law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are " 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996). The presence or absence of those "tender spots"—or "trigger spots" as referred to at times in the record—are a critical component of this case.

tive Law Judge (ALJ). A hearing was held on November 4, 1999,[5] at which plaintiff and VE Beth Hoynik were the only witnesses. Plaintiff was represented by counsel.

### B. November 4, 1999 Hearing

#### 1. Plaintiff's Testimony

Plaintiff testified that she was 43 years old, a high school graduate, and had studied accounting for two years at Milwaukee Area Technical College ("MATC"), although she did not receive a degree. (Tr. at 719.) Plaintiff stated that she was most recently employed as a certified nurse's assistant (CNA), a position which required her to bathe and dress patients, assist them to the dining room and therapy sessions, and clean their rooms. Her previous employment included factory jobs, a mail room position at MATC, and work in fast food restaurants. (Tr. at 720–22.)

Plaintiff testified that she could no longer work due to constant pain in her neck, back and legs. She stated that her fibromyalgia caused her muscles to tighten up, preventing her from getting out of bed. She indicated that she had trouble grasping objects due to numbness in her right thumb following surgery to her right hand and wrist. She stated that this also caused difficulty writing and grooming herself. (Tr. at 726–31.)

Plaintiff further testified that she experienced migraine headaches at least twice per week, which caused disabling pain. She indicated that she had problems with her knees, which had required two surgeries and the use of a brace on her right leg. She complained of a chronic sore throat

due to a problem with her tonsils and a skin condition that affected her hands and feet. She indicated that she experienced occasional seizures, which caused ringing in her ears and headache. Plaintiff was taking six different medications due to her various conditions, with a side effect of drowsiness. (Tr. at 731–37.)

Plaintiff testified that she had good and bad days. On a good day, she might do some light cleaning; on a bad day she did nothing. She stated that her grand-nephew, who lived with her, did the cooking and heavy cleaning. She went grocery shopping with her grand-nephew and her boyfriend, and they carried the bags. (Tr. at 741–45.)

Plaintiff indicated that the longest she could sit or stand was one hour, and the farthest she could walk was two blocks. She testified that she could lift twenty-five pounds and had difficulty bending, stooping and squatting. (Tr. at 746–49.)

#### 2. VE Testimony

VE Hoynik testified that plaintiff's CNA job was classified as medium strength, semi-skilled work; the mail sorter job was sedentary, unskilled work; and the factory jobs were between light and medium, unskilled work. (Tr. at 755.) The ALJ then asked the VE whether there were jobs available for a person limited to unskilled, light work; who needed a sit-stand option;[6] and could perform no overhead work, no prolonged repetitive flexion of the neck, no repetitive pushing, pulling, grasping or gripping, and no work around machinery or unprotected heights. The VE replied that approximately 2000 light as-

---

**5.** The hearing was originally scheduled for September 30, 1999 but was adjourned at plaintiff's request so she could obtain counsel. (Tr. at 709–15.)

**6.** Some individuals must, due to their impairments, go regularly from a seated to a stand-

ing position and vice versa. If the need to change positions cannot be "accommodated by scheduled breaks and a lunch period," SSR 96–9p, the person needs a so-called "sit/ stand option," i.e. the ability to change positions essentially at will.

sembly jobs, 500 mail room jobs, and 2000 cashier jobs would be available for such a person in the greater Milwaukee area. (Tr. at 755–57.) The VE later clarified her response—if the person could perform *no* repetitive pushing, pulling or grasping all of the jobs to which she had referred would be eliminated; if the person could *occasionally* push, pull or grasp the positions would be available. (Tr. at 761–62.)

## C. ALJ's (First) March 21, 2000 Decision

On March 21, 2000, the ALJ issued a decision finding plaintiff not disabled. He concluded that she suffered from severe impairments—fibromyalgia and pseudoseizures, that neither impairment met the Listings, that plaintiff was unable to perform her past work, but that there were a significant number of other jobs she could perform. (Tr. at 320–27.)

## D. First Appeals Council Review

Plaintiff sought review from the Appeals Council, and on March 27, 2001, the Council vacated the ALJ's decision and remanded for another hearing. The Council noted that the ALJ's decision indicated that "William Reynolds" was the VE at the hearing, but the voice on the hearing tape was female (apparently that of Ms. Hoynik).[7] The Council concluded that the summary of VE testimony in the ALJ's decision was inaccurate and remanded for (1) further evaluation of plaintiff's subjective complaints; (2) further consideration of plaintiff's RFC, with specific references to the record; and (3) supplemental evidence from a VE. (Tr. at 329–30.)

## E. September 24, 2001 Re–Hearing

Plaintiff appeared before the same ALJ on September 24, 2001. Plaintiff and VE Laura Koritsoglou were the only witnesses. Plaintiff was again represented by counsel.

### 1. Plaintiff's Testimony

Plaintiff testified that her fibromyalgia began to worsen in March 1998, and that she last worked in June 1998. She indicated that her muscles tightened up to the point where she could not use them. (Tr. at 773–75.) She testified that she was unable to obtain medical treatment in the latter half of 1998 because she had no insurance. She testified that in February 1999 she began seeing Dr. Arain, who gave her shots for the pain. (Tr. at 775–76.)

Plaintiff testified that her fibromylagia was worst in her arms, legs, and back. She rated her pain as between 6 and 10 on a scale of 1–10. (Tr. at 778, 787–88.) She testified that she wore a brace on her right arm. She stated that at times her legs would give out and she would fall. (Tr. at 778–79.) She testified that she experienced migraine headaches about once per week and seizures every few months. She also indicated that she had arthritis in her lower back. (Tr. at 782–85.)

Plaintiff stated that on a good day she would sit on the porch and talk to her neighbors, and maybe wash some dishes; on a bad day, she did nothing. She testified that she has bad days three times per week. (Tr. at 788.) She indicated that she could walk two and one-half blocks, sit for 45 minutes, and lift a gallon of milk. (Tr. at 790–91.)

Plaintiff also testified that she had been seeing a therapist, Paul Barno, for depres-

---

**7.** A review of the record reveals that Reynolds was scheduled to testify at the hearing set for September 30, 1999. (Tr. at 366.) However, that hearing was adjourned to November 4.

Hoynik replaced Reynolds as VE on the adjourned date. In his decision, the ALJ mistakenly indicated that Reynolds was the VE at the November 4 hearing.

sion since March 2001 following a suicide attempt. (Tr. at 791–92.) Finally, plaintiff indicated that she was a recovering cocaine addict and had last used the drug six months before the hearing. (Tr. at 793.)

### 2. VE Testimony

The ALJ asked the VE whether there were any jobs within the following parameters: simple, low stress, light, unskilled work; with a sit/stand option; and no overhead work or prolonged repetitive flexion of the neck, or work around moving machinery and unprotected heights. The VE testified there were 3810 assembler jobs, 8210 information clerk jobs, 2970 order clerk jobs, and 17,370 cashier jobs in the Milwaukee area. (Tr. at 798–99.)

However, given the mental functional limitations outlined in the 9/14/01 report from Paul Barno (Exhibit 33F; Tr. at 654–55), the VE eliminated the assembler job because it required a certain production pace. Given the limitations in Dr. Arain's 12/1/99 (Exhibit 22F; Tr. at 416) and 8/16/01 (Exhibit 32F; Tr. at 629) reports, all of the jobs would be eliminated.

### F. Medical Evidence

At the second hearing, the ALJ admitted all of the exhibits and medical evidence received at the first hearing, as well as two additional exhibits. The medical evidence was as follows.

### 1. Milwaukee Orthopedic Specialists (Dr. Wichman)

Plaintiff was first treated at Milwaukee Orthopedic Specialists in 1976 for an injury to her right thumb, which required surgery. She returned in 1981 following an injury to her right big toe, and in 1983 following a recurrence of pain in her right thumb and pain in her right elbow. She was again seen in 1984 complaining of right thumb and right hip pain. (Tr. at 188–190.)

In 1985, plaintiff returned complaining of left knee pain. On or about September 13, 1985 she underwent arthroscopic repair of a medial meniscus tear, followed by several weeks of physical therapy. (Tr. at 191.)

In April of 1987 plaintiff returned complaining of right hand pain associated with repetitive heavy lifting. She was given a prescription and advised that she could return to work at any time. (Tr. at 191.)

Plaintiff saw Dr. Wichman in September of 1992 due an injury to her right small toe. X-rays revealed a fracture, and Dr. Wichman advised plaintiff to tape the toe. No follow up treatment was recommended. (Tr. at 193.)

Plaintiff saw Dr. Boyle in March of 1993 after suffering a contusion to her right hand at work. She saw Dr. Wichman in July of 1993 complaining of recurrent left knee pain. She was given a prescription for pain medication. (Tr. at 194–95.)

Plaintiff returned to Dr. Wichman on January 24, 1995 for re-evaluation of her right thumb and left knee. She was provided with pain medication. Plaintiff returned on February 27, 1995, and reported that her left knee was giving way and that she had fallen. Her right thumb was improved. Dr. Wichman scheduled an MRI, which revealed a defect in the medial meniscus. On March 21, 1995 plaintiff underwent an arthroscopy with partial synovectomy[8] and excision of fat pad to the left knee. She returned for follow-up on April 28 and was noted to be getting along well. (Tr. at 196–98.)

Plaintiff next saw Dr. Wichman on October 25, 1995, complaining of spasm to her

---

8. A "synovectomy" is an excision of a portion or all of the synovial membrane of a joint.

*Stedman's Medical Dictionary* 1773 (27th ed.2000).

left lower leg. On November 15, 1996, she returned complaining of spasm to both lower legs. She was provided medication. (Tr. at 199.)

Plaintiff returned to Dr. Wichman on March 28, 1997, complaining of pain in both knees. Dr. Wichman had no explanation for her complaints and referred her to a Dr. Agor for a rheumatology consultation. (Tr. at 200.)

Plaintiff next saw Dr. Wichman on February 1, 1999 following an injury to her right ankle when she stepped into a pothole. Dr. Wichman noted that she had been seen at the St. Joseph's Hospital Emergency Room, where a ligament injury was diagnosed. Dr. Wichman referred plaintiff to St. Michael's Hospital for physical therapy. (Tr. at 394.)

Plaintiff returned on March 3, 1999, complaining of swelling and edema of her right ankle. Dr. Wichman noted a probable infection and prescribed an anti-biotic. Plaintiff returned on March 5 and her infection was improved. She did not attend additional scheduled appointments for this injury. (Tr. at 395–96.)

Plaintiff saw Dr. Wichman for a final time on October 13, 1999, complaining of right ankle and hand pain. Dr. Wichman noted: "She has a history of fibromyalgia." (Tr. at 396.) X-rays of the right hand were normal. Dr. Wichman provided medication. (Tr. at 397.)

### 2. Dr. Arain

After Dr. Wichman referred plaintiff to Dr. Agor for a rheumatology consult (see Tr. at 200), Dr. Agor apparently sent plaintiff to Dr. Arain. Plaintiff first saw Dr. Arain on May 12, 1997. Plaintiff complained of severe neck and back pain for the past ten months, and thigh and leg pain which started about three years be-

fore. Dr. Arain's initial impression was that plaintiff suffered from a cervical and shoulder strain, and myofascial pain syndrome. He provided medication and scheduled an EMG and nerve conduction study. (Tr. at 207–08.) The tests were performed the following day and were normal. (Tr. at 205–06.)

Plaintiff returned for a two week follow up on May 29, 1997. One of the medications was helping with sleep and pain, but the other was not helping significantly. Dr. Arain noted "trigger points in the neck and shoulder muscles as well as in the right thigh medially and laterally as well as the right buttock." (Tr. at 204.) Her medication was increased and she was shown stretching exercises.

Plaintiff returned on June 17, 1997. There was mild improvement in her symptoms with the higher dosage of medication, however, she still had pain primarily in the right thigh and left shoulder region. Her lower back pain was better. Examination revealed severe tenderness over the left supraspinatus tendon, consistent with tendinitis. She was given a tendon injection and trigger point injections in the left trapezius and cervical paraspinals at C–7. "She had excellent pain relief with these injections." (Tr. at 203.) Her medications were again changed, and she was advised to continue her stretching exercises.

Plaintiff returned on June 24, 1997, and continued to have pain in the left shoulder region. "She also [had] trigger points in the left teres minor, pectoralis major, the deltoid in two locations and cervical paraspinals at C–7, which were all injected with 0.2% procaine with excellent pain relief." (Tr. at 202.)

Plaintiff did not see Dr. Arain again until February 8, 1999. The record of that date indicates that plaintiff "was lost to follow-up."[9] (Tr. at 392, 604.) Plaintiff

9. As noted, plaintiff testified that she was un-

able to obtain treatment in 1998 due to a lack

complained "of severe sharp shooting pain in her neck." (Tr. at 392.) Dr. Arain noted that in the past he had treated plaintiff for cervical and shoulder strain and myofascial pain. On examination, Dr. Arain noted: "Trigger points are present in the neck and shoulder muscles bilaterally. There are no pectoral trigger points. There is no tenderness of the supraspinatus tendons bilaterally." (Tr. at 392.) His impression was of "chronic cervical and shoulder strain and myofascial pain. In addition, she is having more sharp shooting pains in the neck which may be due to degenerative changes." (Tr. at 392.) He ordered x-rays of the cervical region and started her on Paxil and Norflex, which had helped in the past.

Plaintiff returned on February 23, 1999 and related that the medications worked very well for her neck pain. (Tr. at 391, 605.) The cervical x-rays were normal. Dr. Arain opined: "The pain is most likely coming from a muscle spasm in the neck and shoulder muscles." (Tr. at 391.) He stated that plaintiff's "neurological examination remains stable. She continues to have trigger points in the neck and shoulder muscles." (Tr. at 391.) Dr. Arain showed plaintiff some neck and shoulder stretching exercises and continued her medication.

Plaintiff returned on March 11, 1999, and reported that her neck and shoulder pain had improved with the use of Paxil and Norflex. (Tr. at 385, 606.) Dr. Arain noted that the "trigger points in her neck and shoulder muscles are still present but not as severe." (Tr. at 385.) Her medication was continued.

On April 22, 1999, plaintiff reported her history of seizures to Dr. Arain, who scheduled an EEG test. (Tr. at 384, 607.) Dr. Arain noted that plaintiff's neck and shoulder pain was controlled with Paxil

and Norflex, but her right hip and thigh pain was not improving. He therefore increased the Paxil dosage for her "myofascial pain syndrome." (Tr. at 384.) The EEG test was performed on April 26, 1999, and it was normal, when plaintiff was awake and asleep. (Tr. at 608.)

Plaintiff returned on July 12, 1999. Dr. Arain noted that in

> addition to pseudoseizures, she has myofascial pain syndrome of the neck, shoulders, hips and thighs and chronic headaches. The headaches are occurring about twice a week. The remainder of her myofascial pain is well controlled.
>
> Examination reveals continued trigger points in the neck, shoulders, hips and thighs. Her neurological examination is otherwise normal.

(Tr. at 406.) He increased her Paxil dosage and prescribed a new medication for her headaches.

Plaintiff next saw Dr. Arain on September 14, 1999, and complained of sharp shooting pain in the right neck and shoulder region, and of numbness in the right hand. On examination, Dr. Arain noted: "Trigger points are present in the right supraspinatus, infraspinatus and teres minor region." (Tr. at 407.)

He opined:

> She has findings suggestive of peripheral nerve entrapment, in particular ulnar neuropathy at the wrist needs to be ruled out. Cervical radiculopathy is possible, though unlikely. The pain is the right neck and shoulder is most likely myofascial in origin due to the above-mentioned trigger points.

(Tr. at 407.) He continued her medications and scheduled an EMG and nerve conduction studies.

*of insurance.*

Dr. Arain's September 20, 1999 record indicated that plaintiff was still experiencing severe sharp shooting pains in the right neck and shoulder, with numbness in her right hand. He completed the nerve conduction studies, which were normal, and EMG, which revealed mild denervation/reinnervation changes in the right lower cervical paraspinals. His impression was one of right cervical radiculopathy. He scheduled an MRI of the cervical spine. (Tr. at 609–10.)

Dr. Arain's October 7, 1999 note indicated that plaintiff's MRI revealed "minimal protrusion of the C5–6 disc slightly to the left of midline." [10] (Tr. at 408.) However, he stated that "[t]here is no definite evidence of any cervical etiology of her pain. Most likely the pain is myofascial in origin." (Tr. at 408.) Dr. Arain noted that plaintiff had experienced a witnessed seizure at St. Francis Hospital following a tonsillectomy and was prescribed Depakote. She was also experiencing low back pain following a fall at home. On examination, Dr. Arain noted: "Trigger points are present in the neck and shoulder muscles, and the lumbar paraspinals." (Tr. at 408.) Dr. Arain directed plaintiff to continue her medication and ordered lumbar x-rays.

Dr. Arain's October 21, 1999 note indicated that plaintiff "has cervical and lumbar strain and myofascial pain." (Tr. at 411.) He noted: "Severe trigger points and spasm are present in the lumbar paraspinals and parasacral region." (Tr. at 411.) The lumbar x-ray revealed: "Osteoarthritis of the facets at L4–5 and 5–1 billaterally; Mild osteophytosis of the vertebral bodies from L3–5; and Atherosclerosis of the aorta." (Tr. at 410, 446.)

On October 25, 1999, Dr. Arain conducted another EEG, which was "abnormal, focal and paroxysmal, due to occipital epileptogenic tendency." (Tr. at 611–12.) Plaintiff had a witnessed seizure during the test, which continued for about two minutes. (Tr. at 611.) On October 28, Dr. Arain increased her Depakote. He continued her other medications. Dr. Arain noted that her "low back spasm and trigger points are less severe than before." (Tr. at 612.)

On October 25, 1999, Dr. Arain also completed a report for the Wisconsin Department of Social Services indicating that plaintiff's diagnoses were; seizure disorder, fibromyalgia symdrome, lumbar facet arthropathy, and chronic headaches. He indicated that her prognosis was "poor" and that he believed she would "be seriously impaired and unable to work or return to normal functioning for at least 12 months." (Tr. at 411.)

On December 1, 1999, Dr. Arain completed a "Fibromyalgia Residual Functional Capacity Questionnaire." (Tr. at 416.) He indicated that plaintiff met the American Rheumatological criteria for fibromyalgia,[11] and that she had "[t]ender points in the subocciputal, sternocleidomastoid, trapezius, supraspinatus, upper pectorals, bilateral forearms, upper buttocks, hips, medial knee [and] medical calves bilaterally." (Tr. at 416.) He indicated that she was not a malingerer and suffered chronic, daily, bilateral pain in all areas identified on the form. He indicated that plaintiff's pain was severe enough to often interfere with her attention and concentration. He opined that she was incapable of even "low

---

10. An x-ray taken on September 23, 1999 revealed "[m]inimal posterior protrusion of the C5–6 intervertebral disk." (Tr. at 430.) As noted, x-rays of the cervical spine taken on February 15, 1999 were normal. (Tr. at 434.)

11. Presumably, this referred to the American College of Rheumatology guidelines, which require at least 11 of 18 tender points on the body in order to confirm a diagnosis of fibromyalgia. *See Green–Younger v. Barnhart,* 335 F.3d 99, 107 (2d Cir.2003); *see also Sarchet,* 78 F.3d at 306.

stress" work. (Tr. at 418.) He listed her functional abilities as walking two blocks; continuously sitting one hour and standing 15 minutes; standing and walking less than two hours out of an eight hour day; and sitting about two hours out of an eight hour day. He indicated that she needed to get up and walk every 20 minutes and required the ability to shift from a seated to a standing position at will. She required unscheduled breaks during an eight hour day (at least one per hour, where she would lie down for 15 minutes). She could not lift and carry anything, not even a grocery bag. She had significant limitations in reaching, handling and fingering, and could do no overhead work. Neither could she "stoop" or "crouch." (Tr. at 421.) Her impairments were likely to cause more than four work absences per month. (Tr. at 421.)

On January 17, 2000, plaintiff returned to see Dr. Arain. She had good pain relief in the neck and shoulder following "trigger point injections." (Tr. at 613.) However, the pain had "shifted" to the parascapular region. (Tr. at 613.) He noted: "She has fibromyalgia syndrome, chronic headaches and cervical and shoulder strain, lumbar facet arthropathy at L4–5 and L5–S1 and seizure disorder.... Examination reveals severe trigger points in the right trapezius, supraspinatus, infraspinatus and teres minor which were injected with procaine 2% and normal saline." (Tr. at 613.)

Plaintiff next saw Dr. Arain on February 2, 2000. He stated that she suffers from right shoulder strain, right rotator cuff syndrome, chronic tension/vascular headaches and fibromyalgia syndrome. He noted that her headaches continue frequently and were not controlled with her medication. He indicated that her shoulder pain improved with the trigger point injections, but the pain had now shifted to the tip of the shoulder. He provided another injection. (Tr. at 616.)

However, when plaintiff returned on February 16, her shoulder pain had not improved at all with the trigger point injection. The headaches had improved somewhat with a new medication. Dr. Arain noted: "Trigger points are present in the right neck and shoulder muscles." (Tr. at 617.) He ordered an MRI of the right shoulder because plaintiff was not responding to conservative treatment. (Tr. at 617.) The MRI was performed on February 17. Because plaintiff had a hard time remaining still, the exam was limited. However, the doctor noted mild degenerative changes at the acromioclavicular joint and tedonopathy within the supraspinatous tendon. (Tr. at 618.)

Plaintiff returned to see Dr. Arain on March 29, 2000. On examination, Dr. Arain noted "continued severe tenderness over the right supraspinatus tendon. Trigger points are present in the right neck and shoulder muscles as usual." (Tr. at 619.) Dr. Arain then referred her to St. Joseph's Hospital for physical therapy for right supraspinatus tendinitis, rotator cuff syndrome, and cervical and shoulder strain and myofascial pain. (Tr. at 619.)

Plaintiff saw Dr. Arain again on April 26, 2000. On examination, trigger points were "present in the right neck and shoulder region with tenderness of the right supraspinatus tendon." (Tr. at 620.) She returned on May 10, and it was noted that her shoulder pain had not responded to physical therapy. (Tr. at 621.) On examination, the doctor noted: "Severe trigger points are present in the right neck and shoulder region with tenderness of the right supraspinatus tendon. Deltoid tendon tenderness is also present now." (Tr. at 621.) Dr. Arain provided trigger point injections. (Tr. at 620.)

On May 24, 2000, Dr. Arain noted trigger points in the "right supraspinatus tendon, right deltoid tendon, right lower leva-

tor scapulae and right rhomboids." (Tr. at 622.) He provided injections. (Tr. at 622.) On June 8, he noted trigger points "in the neck and shoulder muscles, rhomboids and parascapular muscles, as well as thoracic paraspinals." (Tr. at 625.) He ordered an MRI of the cervical spine (Tr. at 625), completed on June 9, which was negative. (Tr. at 624.)

On June 22, 2000 plaintiff returned, complaining of severe pain in the neck and shoulder region. Trigger points were noted "in the neck and shoulder muscles, rhomboids and parascapular muscles bilaterally." (Tr. at 626.) On July 6, 2000, Dr. Arain noted trigger points "in the neck and shoulder muscles as well as in the lumbar paraspinals and parasacral region." (Tr. at 627.) Plaintiff had also begun experiencing low back pain. (Tr. at 627.) On July 20, 2000, Dr. Arain noted "[s]evere trigger points ... in the lumbar paraspinals and parasacral region." (Tr. at 628.) Dr. Arain referred her to Dr. Wichman for an orthopedic consultation. (Tr. at 628.)

Finally, on August 16, 2001, Dr. Arain completed a medical assessment form pertaining to plaintiff. He listed her diagnoses as chronic tension migraines, rotator cuff syndrome, epileptic and non-epileptic seizures, cervical and shoulder strain, and fibromyalgia. (Tr. at 629.) He indicated that her prognosis was poor, and that she suffered from chronic pain and fatigue and daily pain all over the body. (Tr. at 629.) He opined that her symptoms would interfere with attention and concentration several times a day. (Tr. at 630.) He stated that she could walk two and one-half blocks, continuously sit or stand 45 minutes, sit less than two hours in an eight hour day, stand or walk about two hours in an eight hour day, and would require about five unscheduled breaks during a work shift. (Tr. at 630–31.) He opined that she could rarely lift less than 10

pounds, and never lift more than that. She could never twist or stoop, and had significant limitations in reaching, handling and fingering. He also imposed several environmental limitations, including avoidance of all exposure to extreme cold, heat or humidity. (Tr. at 632.) Finally, he opined that she would have "good days" and "bad days," and would be absent more than four days per month. (Tr. at 633.)

### 3. Paul Barno, MS/Milwaukee Health Services

Plaintiff also submitted a September 14, 2001 report from Paul Barno, who had been treating her for depression. (Tr. at 654.) He indicated she had a "fair" ability to: remember work procedures and instructions, carry out short and simple instructions, maintain attention for a two hour segment, make simple work-related decisions, complete a normal work day without interruption due to psychological symptoms, perform at a consistent pace, get along with others, respond appropriately to changes, and deal with stress. Her ability to carry out detailed instructions and deal with the stress of semi-skilled or skilled work was "poor." (Tr. at 655.) According to the report, a designation of "fair" meant that the ability to function was seriously impaired but not precluded. "Poor" meant that the person had no ability to function in that area. (Tr. at 654.) Finally, he indicated that she would be absent from work due to her impairments more than three times per month. (Tr. at 655.)

Mr. Barno's treatment notes begin on March 26, 2001; plaintiff was to receive biweekly counseling. (Tr. at 673–74.) The final note, dated July 23, 2001, indicated that plaintiff continued "to experience problems with depression, most notably problems with sleep and mood swings. This may also be related to the multiple

medical problems that the client has." (Tr. at 667.) A Behavioral Health Services Initial Assessment form dated June 6, 2001 listed a diagnosis of major depression. (Tr. at 661–62.)

### 4. Aurora Medical Group (Dr. Marra)

Plaintiff first received treatment for her seizure disorder from Dr. Marra. Plaintiff first saw Dr. Marra on September 14, 1995, for evaluation after a trip to the Sinai Samaritan ER following an apparent seizure. Dr. Marra indicated that there was a strong clinical suspicion of pseudoseizures. He scheduled a 24 hour ambulatory EEG in order to determine whether "an epileptiform diathesis can be confirmed." (Tr. at 216.) The test was performed on October 11 and was normal. Dr. Marra discussed the results with plaintiff on October 23, 1995, indicating that her seizures were most likely psychogenic pseudoseizures. Plaintiff apparently became upset with this explanation; Dr. Marra concluded that "she has a vested interest in the diagnosis of epilepsy." (Tr. at 217.) Dr. Marra referred her for another test and a second opinion from Dr.Lee, but Dr. Lee also concluded that plaintiff suffers from pseudoseizures. (Tr. at 217.)

Plaintiff called Dr. Marra following a September 1997 visit to the Sinai ER for an apparent seizure,[12] requesting a return to work note. Dr. Marra told her to contact her primary doctor for the note because he was no longer caring for her, and she did not have a bona fide seizure disorder.[13] (Tr. at 218.)

### 5. Dr. Calimlim

Plaintiff saw Dr. Calimlim, an ear, nose and throat specialist, for her recurrent sore throat. Her first visit was on September 13, 1999, and Dr. Calimlim diagnosed recurrent tonsilitis, bilateral tonsil tags, and a history of chronic recurring otitis externa.[14] He recommended laser removal of tonsil tags and prescribed medication. (Tr. at 399.) On October 5, 1999, plaintiff underwent laser excision of the left tonsil tag at St. Francis Hospital. (Tr. at 401–02.) As indicated in Dr. Arain's October 7 note, plaintiff apparently had a seizure after this operation.[15] (Tr. at 408.)

### 6. Dr. Baylon

Plaintiff saw Dr. Baylon on January 22, 1999 due to leg pain, and on March 9, 1999 due to ear ache and flu-like symptoms. (Tr. at 377–78.) She returned on July 13, 1999 complaining of a rash on her face, arms and legs. Dr. Baylon diagnosed an allergy. (Tr. at 376.) Plaintiff returned on August 17, 1999 with a possible bladder infection and continued ear pain. (Tr. at 375.) Plaintiff was again seen on August 31, 1999 complaining of muscle pain and an inability to grasp objects. (Tr. at 374.)

---

12. The records from Sinai Samaritan indicate that plaintiff was taken to the ER on September 18, 1997, after experiencing a seizure. She was discharged with instructions to see her doctor if seizures continued and to stop using cocaine. (Tr. at 209–14.) She was also seen at the Sinai ER on February 16, 1998, after apparently having a reaction to a seizure medication called Togretal.

13. As noted, Dr. Arain later confirmed a seizure during an EEG test. (*See* Tr. at 611–12.)

14. In his initial record, Dr. Calimlim also noted: "She has fibromyalgia and is taking Paxel [sic]." (Tr. at 399.)

15. According to a note from St. Francis Hospital, plaintiff advised a nurse prior to surgery that she "usually has a seizure after a general anesthetic." (Tr. at 461.) The post-operative note from St. Francis indicated that this was a "possible seizure," during which plaintiff was unresponsive and biting her tongue. (Tr. at 468.)

### 7. Milwaukee Health Services (Isaac Coggs Health Center)

An August 10, 2001 note from Isaac Coggs Clinic manager Renee Buchholz, RN, indicated that plaintiff "has the diagnosis of fibromyalgia. This is a chronic disease which is very painful." (Tr. at 587.) The balance of the Isaac Coggs records concerned routine care, and complaints of lower leg pain, thickened skin on the feet and a sore throat. (Tr. at 588–94.) A February 26, 2001 note indicated that plaintiff is in "constant pain," has seizures, a "pinched nerve in neck," and "arthritis." (Tr. at 595.)

### 8. Hospital Records

Plaintiff also received treatment in various hospitals.

#### a. Froedert Memorial Lutheran Hospital

Plaintiff was seen at the Froedert ER on June 22, 1998 complaining of chest wall pain. X-rays revealed no acute cardiopulmonary disease; she was provided medication and advised to follow up with her primary care physician. (Tr. at 253–58.)

Plaintiff returned to the Froedert ER on July 22, 1998 complaining of right leg pain. She underwent a right lower extremity color doppler exam, which was unremarkable; an x-ray was also normal. She was again provided with pain medication and told to follow up with her doctor. (Tr. at 262–71.)

Plaintiff went to the ER on September 17, 1998 due to an upper respiratory infection, and again on October 13, 1998 for a severe migraine headache. She was given medication. (Tr. at 272–81.)

Plaintiff returned on October 19, 1998, apparently due to right knee pain. She underwent an MRI, which was normal. (Tr. at 283.) Plaintiff was again seen on November 2, 1998 after twisting her right ankle. (Tr. at 290.) Plaintiff returned on January 12, 2001 with a toothache and on January 30, 2001 with a cough. (Tr. at 349–64.)

#### b. St. Joseph's Hospital and Dr. Vinluan

Plaintiff visited the St. Joseph's ER on October 31, 1998 after spraining her ankle. X-rays revealed no fractures, and plaintiff was provided medication and a short leg splint. She was sent home with instructions to ice and elevate her ankle.[16] (Tr. at 440–44.)

Plaintiff was taken by ambulance to the St. Joseph's ER for an apparent seizure on November 1, 1999. (Tr. at 422.) She returned on January 15, 1999 complaining of nausea, dizziness and abdominal pain. (Tr. at 421) She was again seen in the St. Joseph's ER on February 14, 1999, and found to have "[a]cute viral syndrome with labyrinthitis"[17] and an acute urinary tract infection. (Tr. at 433.)

As noted, Dr. Arain referred plaintiff to St. Joseph's for physical therapy in April 2000 related to her right shoulder and neck pain. (Tr. at 505, 507.) Plaintiff was discharged on June 15, 2000 with "no goals met" secondary to continued pain and attendance problems. (Tr. at 506, 510.)

Plaintiff again visited the St. Joseph's ER on July 31, 2000 because of "boils" under her left arm. (Tr. at 489.) She was provided a prescription. However, the medication apparently proved ineffective, and on August 4, 2000, plaintiff underwent

---

**16.** Plaintiff later saw Dr. Wichman for this injury. (Tr. at 394.)

**17.** Labyrinthitis is inflammation of the internal ear, sometimes accompanied by vertigo. *Stedman's Medical Dictionary* 957 (27th ed.2000).

a "Hidradenectomy" with Dr. Vinluan for correct her "Hidradenitis," (Tr. at 516), which is an inflammation of the sweat glands. *Stedman's Medical Dictionary* 821 (27th ed.2000). The operation was apparently successful, and she was discharged with medications. (Tr. 516–22.) However, it appears that plaintiff experienced a seizure shortly after the procedure was completed. (Tr. at 567.)

### c. St. Francis Hospital

Plaintiff's tonsil tag surgery was performed at St. Francis Hospital, as was her October 1999 lumbar x-ray. (Tr. at 445–486.) These procedures are discussed under the sections for Drs. Calimlim and Arain.

On August 5, 2000, plaintiff visited the St. Francis ER complaining of chest wall pain. This was the day after she underwent surgery with Dr. Vinluan. (*See* Tr. at 555.) Plaintiff admitted that she had used cocaine three days ago. (Tr. at 547.) She was discharged in good condition with a diagnosis of acute chest wall pain. (Tr. 547–48.) On September 8 and 15, 2000 plaintiff underwent a "left stellate ganglion block" of the left upper extremity on Dr. Arain's referral. (Tr. at 527–42.) The out patient follow up note indicated that plaintiff had excellent improvement in her pain following the procedure. (Tr. at 526.) An examination done by Dr. Chiou prior to the procedure revealed "multiple trigger-point tenderness along the bilateral trapezius, as well as the posterior cervical muscle." (Tr. at 531.)

### d. Curative Rehabilitation Center

Plaintiff underwent physical therapy for her right knee at Curative from August to November 1998. Plaintiff reported that her knee gave out while she was at church and became too weak and painful to walk on. She was provided an exercise program, with the goals of reducing her pain and allowing a return to work. The record does not reveal whether the goals of therapy were met. (Tr. at 308–16.)

Plaintiff also went to Curative for therapy on her right ankle in February 1999. However, she was discharged on April 1, 1999 with goals not met; the discharge note indicated that plaintiff was unable to attend therapy consistently due to illness and because she developed an infection; she did not re-schedule.[18] (Tr. at 386–87.)

### 9. Consulting Physician Reports

Dr. Chan completed a physical functional capacity assessment for the Social Security Administration on November 13, 1997. Dr. Chan listed plaintiff's diagnoses as cervical strain, myofascial pain and seizures, and indicated that plaintiff could: lift 50 pounds occasionally and 25 pounds frequently; stand or walk for six hours out of an eight hour day; sit six hours out of an eight hour day; and push/pull in an unlimited fashion. Dr. Chan indicated that plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (Tr. at 221–28.)

Dr. Warrior completed a psychiatric review technique form for the Administration on March 8, 1999, in which she concluded that plaintiff had no medically determinable mental impairment. (Tr. at 234.)

Dr. Baumblatt completed a physical residual functional capacity evaluation for the Administration on May 20, 1998, in

---

**18.** As noted, plaintiff saw Dr. Wichman for her ankle problem on February 1, 1999. Dr. Wichman referred her to St. Michael's Hospital for physical therapy. She ended up doing the therapy with Curative. However, she developed an infection and returned to Dr. Wichman on March 3, 1999; he prescribed an anti-biotic. Plaintiff returned on March 5 and her infection had improved.

which he indicated that plaintiff could lift 50 pounds occasionally, 25 pounds frequently; stand/walk six out of eight hours; sit six out of eight hours; and push/pull in an unlimited fashion. He concluded that she had no postural, manipulative, visual, or communicative limitations, but, because of her pseudo-seizures, should avoid working around hazards such as machinery or heights. (Tr. at 245–52.) He completed another report on November 4, 1998, which said the same thing. (Tr. at 299–306.) The latter report was reviewed and affirmed by Dr. Callear on March 3, 1999. (Tr. at 306.)

### G. ALJ's (Second) March 28, 2002 Decision

On March 28, 2002, the ALJ issued a decision again denying plaintiff's claim. He concluded that she suffered from severe impairments—mild osteophytosis of the lumber vertebral bodies, diffuse pain and a history of pseudoseizures. (Tr. at 19.) He also indicated that plaintiff's past use of drugs was "material" to the finding of disability, that is, she would be found not disabled even if she ceased use of drugs. (Tr. at 17.)

In the body of his decision, the ALJ stated that plaintiff did not suffer from fibromyalgia:

> While a diagnosis of fibromyalgia has been made in the record, the undersigned finds that absent the defined trigger points necessary for a diagnosis of fibromyalgia, none can be made. The term "fibromyalgia" was used in the record because examining physicians did not know what else to call her complaints of pain.

(Tr. at 19.) However, in his specific, numbered findings, he listed plaintiff's severe impairments as fibromyalgia and pseudoseizures. (Tr. at 21 # 3.) In any event, he concluded that plaintiff's impairments did not meet or equal the Listings. (Tr. at 19.) Further, he found that her complaints of pain were "overstated" and "not corroborated by the objective medical evidence." (Tr. at 19.)

The ALJ concluded that plaintiff retained the RFC to perform light, simple, unskilled, low stress work with a sit/stand option, requiring no overhead work or working around dangerous machinery. (Tr. at 20, 21 # 5.) He rejected Dr. Arain's physical assessment, stating that it was "based on the claimant's self-reported limitations." (Tr. at 19.) He further stated that Dr. Arain's examinations of plaintiff revealed her to have "normal strength, negative straight-leg raising, normal MRI scan of the claimant's back and knees and normal neurological examination." (Tr. at 19.)

At step four, the ALJ found that based on this RFC plaintiff could not perform her past work as a CNA. However, at step five, he concluded, based on the testimony of the VE and using Grid Rule 202.21 as a framework,[19] that there were available jobs she could perform. Thus, he concluded that plaintiff was not disabled. (Tr. at 20.)

### H. Second Appeals Council Review and District Court Action

Plaintiff requested review by the Appeals Council, but on July 10, 2002 the Council denied her request. (Tr. at 7–8.) Plaintiff then commenced this action, alleging various errors on the part of the ALJ:

**19.** Rule 202.21 directs a finding of "not disabled" for younger individuals with a high school education or above whose previous work experience is considered skilled or semi-skilled but with non-transferable skills, who are capable of light work. *See Stanistreet v. Chater,* 21 F.Supp.2d 1129, 1131 n. 6 (C.D.Cal.1995), *aff'd,* 106 F.3d 409 (9th Cir. 1997) (citing 20 C.F.R. §§ 416.963(b), 416.964(b)(4), 416.965).

(1) that the ALJ erred in rejecting the diagnosis of fibromyalgia; (2) that the ALJ improperly rejected plaintiff's testimony regarding her symptoms; (3) that the ALJ failed to properly evaluate and improperly rejected the opinions of plaintiff's treating physicians; (4) that the ALJ ignored testimony from the VE that plaintiff could perform no jobs; (5) that the ALJ ignored the opinion of plaintiff's treating psychotherapist; (6) that the ALJ's RFC finding was not supported by any medical evidence; and (7) that the ALJ ignored the issue of the basis for the VE's testimony concerning the number of jobs plaintiff could hypothetically perform.

On July 23, 2003, Judge Gorence recommended that the ALJ's decision be reversed. She concluded that the ALJ had failed to sufficiently explain his reasoning for rejecting Dr. Arain's diagnosis of fibromaylgia. Therefore, she recommended that the matter be remanded for the ALJ to re-evaluate all of the evidence regarding fibromyalgia, paying particular attention to *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996), and SSR 96–2p and SSR 96–5p with respect to the evaluation of plaintiff's treating physician's opinion.

As noted, the Commissioner has objected to the recommendation. She argues that the ALJ properly rejected Dr. Arain's diagnosis because it was unsupported by the record and properly explained his reason for doing so. The Commissioner contends that Dr. Arain's records did not reflect that plaintiff met the criteria for fibromyalgia because she did not display the required number of "tender" points. She also argues that the ALJ's statement that fibromyalgia was used as a term of convenience was supported by Dr. Arain's records, which did not consistently list fibromyalgia as the diagnosis. She states

that the ALJ's Finding # 3—that plaintiff has fibromyalgia—was merely a typographical error. Finally, the Commissioner argues that the ALJ accommodated all of plaintiff's limitations in setting RFC, and plaintiff has failed to identify any additional limitations.

## III. STANDARDS OF REVIEW

### A. Magistrate Judge's Recommendation

█ Where a party timely objects to a magistrate judge's recommendation, I conduct a de novo review of the objected-to portions, 28 U.S.C. § 636(b)(1); *see United States v. Raddatz*, 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); and may review de novo any other aspects as I see fit, *see Delgado v. Bowen*, 782 F.2d 79, 81–82 (7th Cir.1986). Based on the Commissioner's objection, I will conduct a de novo review.

### B. ALJ's Decision

█ Under 42 U.S.C. § 405(g) a district court may affirm, modify or reverse an ALJ's decision,[20] with or without remanding the case for a rehearing. However, review of the decision is limited, and the ALJ's findings must be upheld if supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable mind would accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir.2000). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from

**20.** Because the Appeals Council denied review of plaintiff's case, the ALJ's decision became the final decision of the Commission-

er. *Herron*, 19 F.3d at 332 (citing 20 C.F.R. § 404.981).

its weight. *Young v. Sec'y of Health & Human Services,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review "'must be more than an uncritical rubber stamp.'" *Delgado,* 782 F.2d at 82 (quoting *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984)).

 Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir.2000); *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Binion,* 108 F.3d at 782.

 If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his reasoning. *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001). "Even if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Hodes v. Apfel,* 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet,* 78 F.3d at 307). Finally, ALJs "must not

succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970.

## IV. DISCUSSION

There are three primary issues in this appeal. First, did the ALJ err in rejecting the diagnosis of fibromyalgia? Second, did the ALJ properly evaluate plaintiff's testimony concerning her pain and other symptoms? Third, did the ALJ err in determining plaintiff's RFC? I address each in turn.

## A. Rejection of Diagnosis of Fibromyalgia

 I agree with Judge Gorence that the ALJ erred in concluding that plaintiff did not suffer from fibromyalgia. Plaintiff's treating physician, Dr. Arain, diagnosed plaintiff with this condition. Treating source opinions must be given special consideration in Social Security cases. *Dominguese v. Massanari,* 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001).

> If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight.

SSR 96–8p.

> If the ALJ finds that the opinion does not warrant controlling weight, the ALJ may not simply reject the opinion. SSR 96–2p. He still must evaluate the opinion's weight by looking at the length, nature and extent of the plaintiff and physician's treatment relationship, the degree to which the opinion is supported by evidence, the opinion's consistency with the record as a whole, whether the doctor is a specialist, and "other fac-

tors." 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p. Regardless of the weight the ALJ ultimately gives the treating source opinion, the ALJ must "give good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2).

*Dominguese,* 172 F.Supp.2d at 1100.

In the present case, the ALJ rejected Dr. Arain's diagnosis with the following statement:

> While a diagnosis of fibromyalgia has been made in the record, the undersigned finds that absent the defined trigger points necessary for a diagnosis of fibromyalgia, none can be made. The term "fibromyalgia" was used in the record because examining physicians did not know what else to call her complaints of pain.

(Tr. at 19.) This analysis was flawed.

Dr. Arain stated that plaintiff met the ACR criteria for fibromyalgia and indicated that she had "[t]ender points in the subocciputal, sternocleidomastoid, trapezius, supraspinatus, upper pectorals, bilateral forearms, upper buttocks, hips, medial knee [and] medical calves bilaterally." (Tr. at 416.) Apparently, the ALJ reviewed the treatment records and concluded that these trigger points did not exist.[21] (Tr. at 19.) But is not the job of the lay ALJ to review the medical data and render his own diagnosis. *See, e.g., Blakes v. Barnhart,* 331 F.3d 565, 570 (7th Cir.2003). In *Bolan v. Barnhart,* 212 F.Supp.2d 1248, 1262 (D.Kan.2002), the court reversed an ALJ's decision based on a similar error:

> [T]he ALJ's broad assertion that "the medical evidence identifies no clinical signs typically associated with chronic musculoskeletal pain, such as muscle atrophy, deformity, loss of motion, neurological deficits" is an improper justification for disregarding an opinion of a treating source. The ALJ is not a medical expert on identifying the clinical signs typically associated with chronic musculoskeletal pain. Thus, the ALJ is not entitled to sua sponte render a medical judgment of what he thinks are the clinical signs typically associated with chronic musculoskeletal pain without some type of support for this determination. The ALJ's duty is to weigh conflicting evidence and make disability determinations; he is not in a position to render a medical judgment.

Similarly, in the present case, the ALJ is not an expert at diagnosing fibromyalgia; thus, it was improper for him to conclude that plaintiff did not display the necessary symptoms. The ALJ cited no contrary medical evidence in reaching this conclusion and a review of the record reveals none. "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-

---

**21.** The ALJ accepted that Dr. Arain used the term "trigger point" synonymously with "tender point." The Commissioner argues that it cannot be assumed they are the same thing. However, in reviewing the ALJ's decision I am limited to the reasons *he* supplied; I cannot consider the post hoc arguments of the Commissioner. *See Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir.2002). In any event, there is no indication in the record that by using the term "trigger point" Dr. Arain meant anything other than "tender point" as that term is defined by the ACR. Other doctors apparently use the terms synonymously. *See Green–Younger,* 335 F.3d at 103 (noting, in fibromyalgia case, that on examination doctor found "trigger points"); *Criner v. Barnhart,* 208 F.Supp.2d 937, 940 (N.D.Ill. 2002) (stating that doctor found "trigger points" for fibromyalgia); *Gister v. Massanari,* 189 F.Supp.2d 930, 934 (E.D.Wis.2001) (noting, in fibromyalgia case, that doctors "provided clinically demonstrable evidence regarding trigger points").

examining physician does not, by itself, suffice." *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.2003). In any event, the consulting state agency physicians in this case accepted the diagnosis,[22] which was also confirmed and/or accepted by others who treated plaintiff. (*See* Tr. at 396, 399, 587; *see also* Tr. at 537.)

Moreover, even if it was proper for the ALJ to scour Dr. Arain's treatment records for the necessary number of trigger points, his conclusion was suspect. On May 29, 1997, Dr. Arain noted "trigger points in the neck and shoulder muscles as well as in the right thigh medially and laterally as well as the right buttock." (Tr. at 204.)[23] On June 24, 1997, she had "trigger points in the left teres minor, pectoralis major, the deltoid in two locations and carevical paraspinals at C–7." (Tr. at 202.) In February and March 1999, she had trigger points in the neck and shoulder muscles bilaterally. (Tr. at 385, 391, 392.) On July 12, 1999, she had "continued trigger points in the neck, shoulders, hips and thighs." (Tr. at 406.) On September 14, 1999, she had trigger points "in the right supraspinatus, infraspinatus and teres minor region." (Tr. at 407.) On October 7, 1999, trigger points were present in the "neck and shoulder muscles, and the lumbar paraspinals." (Tr. at 408.) On October 21, 1999, Dr. Arain noted severe trigger points in the "lumbar paraspinals and parasacral region." (Tr. at 411.) On January 17, 2000, plaintiff had "severe trigger points in the right trapezius, supraspinatus, infraspinatus and teres minor." (Tr. at 613.) On February 16, 2000, trigger points were "present in the right neck and shoulder muscles." (Tr. at 617.) Dr. Arain noted the same on March 29, 2000. (Tr. at 619.) In April 2000 she had severe trigger points in the right neck and shoulder with tenderness in the right supraspinatus region. (Tr. at 620, 621.) On May 24, 2000, she had trigger points in the "right supraspinatus tendon, right deltoid tendon, right lower levator scapulae and right rhomboids." (Tr. at 622.) On June 8, 2000, Dr. Arain noted trigger points "in the neck and shoulder muscles, rhomboids and parascapular muscles, as well as thoracic paraspinals." (Tr. at 625.) On June 22, 2000, trigger points were noted "in the neck and shoulder muscles, rhomboids and parascapular muscles bilaterally." (Tr. at 626.) On July 6, 2000, Dr. Arain noted trigger points "in the neck and shoulder muscles as well as in the lumbar paraspinals and parasacral region." (Tr. at 627.) On July 20, 2000, Dr. Arain noted "[s]evere trigger points ... in the lumbar paraspinals and parasacral region." (Tr. at 628.)

In light of this evidence, none of which the ALJ discussed, it is impossible to accept his conclusion that the defined trigger points necessary for a diagnosis of fibromyalgia were "absent" as supported by

**22.** Dr. Baumblatt indicated that plaintiff had fibromyalgia (Tr. at 300), and Dr. Chan indicated that she had "mysofascial pain with trigger pts in neck, upper back, shoulders, R buttocks and thigh." (Tr. at 222.) As will be discussed, "myofascial pain" is a term related to fibromyalgia.

**23.** The Commissioner argues that medical records created before plaintiff's alleged disability onset date should not be considered. However, there is nothing wrong with reviewing these records to confirm the diagnosis of fibromyalgia. A social security claimant may suffer from a condition for a period of time before it is diagnosed or before it becomes disabling. *Cf. Leonard v. Apfel,* No. 00–172–M, 2000 WL 1867742, at *7 (D.N.H. Dec. 19, 2000) (stating that claimant's subjective complaints of pain, while perhaps overstated given her then-currently diagnosed condition, became reasonable after diagnosis of fibromyalgia was made). In the present case, plaintiff testified that her condition began to worsen in March 1998, shortly before she stopped working.

substantial evidence. The ALJ may not ignore an entire line of evidence that is contrary to his ruling. *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir.2003).

The ALJ's statement that the diagnosis of "fibromyalgia" was made because the doctors did not know what else to call her complaints of pain also cannot survive scrutiny. The ALJ cited no medical evidence to support the statement, and the record shows that Dr. Arain followed proper medical procedures in making this diagnosis. The Commissioner argues that the ALJ's statement was supported by the fact that Dr. Arain did not consistently use the term "fibromyalgia" in his notes. But this was no inconsistency at all. Dr. Arain at times stated that plaintiff had "myofascial pain" or "myofascial pain syndrome." "Myofascial pain syndrome" is a condition very similar to fibromyalgia. *See, e.g., Green–Younger,* 335 F.3d at 103 n. 6; *Mondragon v. Apfel,* 3 Fed.Appx. 912, 918, 2001 WL 118292 (10th Cir.2001) (citing *Stanistreet,* 21 F.Supp.2d at 1133 n. 11 (citing *2 Schmidt's Attorneys' Dictionary of Medicine* at M–323 (1995)); *The Merck Manual* 481 (17th ed.1999) (describing fibromyalgia and cross-referencing mysofascial pain syndrome)). The terms have been used interchangeably. *See Sharbaugh v. Apfel,* No. 99–CV–277H, 2000 WL 575632, at *1 n. 4 (W.D.N.Y. Mar. 20, 2000) ("The terms 'Myofascial Pain Syndrome' and 'fibromyalgia' have been used interchangeably for several years to describe generally a condition involving pain in the fibrous tissues, muscles, tendons, ligaments, and other white connective tissues."); *see also Santiago v. Sec'y of Health & Human Servs.,* 46 F.3d 1114 n. 4, 1995 WL 30568, at *4 n. 4 (1st Cir.1995) (citing *The Merck Manual* 1369 (16th ed.1992)).

Further, the fact that Dr. Arain continued to test for other maladies which might explain plaintiff's pain does not defeat his diagnosis of fibromyalgia. "Rather, these negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating 'other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue.'" *Green–Younger,* 335 F.3d at 109 (quoting *Preston v. Sec'y of Health and Human Services,* 854 F.2d 815, 819 (6th Cir.1988)).

Finally, the ALJ's decision was internally inconsistent. In the body of the decision he stated that plaintiff did not have fibromyalgia (Tr. at 19), yet he listed it as a severe impairment in his Findings (Tr. at 21 # 3). The Commissioner claims this was simply a typographical error, and maybe it was, but I have no way of knowing that. In his first decision on this application, the same ALJ concluded that plaintiff *did* suffer from fibromyalgia. (Tr. at 321, 323, 326 # 2.)

Thus, the ALJ's conclusion that plaintiff did not have fibromaylgia was reached in violation of the treating physician rule, was unsupported by any medical evidence, and was contradicted by the ALJ himself. For all of these reasons, the decision must be reversed.

**B. Rejection of Plaintiff's Testimony**

The ALJ also erred in rejecting plaintiff's testimony concerning her symptoms. He stated that her "complaints of diffuse pain are not corroborated by the objective medical evidence." (Tr. at 19.) But there was objective evidence—Dr. Arain diagnosed plaintiff with fibromyalgia, a disease which causes "pain all over." *Sarchet,* 78 F.3d at 306. When a claimant has fibromyalgia, it is inappropriate for an ALJ to reject her claims of pain because they are not verified by traditional medical tests. As the court stated in *Criner:*

The ALJ, in his decision, stated that "the objective findings in this case fail to

provide strong support for the claimant's allegations of disabling symptoms and limitations." (R. 23) The ALJ then cites the fairly normal clinical and medical test results obtained by Dr. Dachman. (R. 23–26.) A cause of Plaintiff's disabling condition, however, is fibromyalgia, and, as discussed in *Sarchet*, in most cases, there will be no objective medical evidence indicating the presence or severity of fibromyalgia. The symptoms are subjective and laboratory tests are of little value.

208 F.Supp.2d at 951 (internal citations and footnote omitted); *see also Gister*, 189 F.Supp.2d at 934–35 (rejecting ALJ's statement that there was no objective evidence supporting claims because doctors "provided clinically demonstrable evidence regarding trigger points"); *Aidinovski v. Apfel*, 27 F.Supp.2d 1097, 1104 (N.D.Ill. 1998) (finding that ALJ erred in relying "on the lack of objective medical evidence to substantiate [plaintiff's] complaints of pain and fatigue").

The ALJ discussed various tests and examinations which were normal. (Tr. at 19.) However, since none of these tests disproved the presence of fibromaylgia, the results were largely irrelevant. *See Sarchet*, 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").

Finally, the ALJ stated that, because plaintiff's complaints were not fully supported by clinical and laboratory findings, he would evaluate her credibility under 20 C.F.R. § 1529 and 416.929.[24] He then briefly reviewed some of plaintiff's testimony concerning her symptoms and physical abilities, and concluded: "After exam-

ining the claimant's record as a whole, objectively and subjectively, the undersigned finds that the claimant's allegations regarding her condition and pain are overstated." (Tr. at 19.)

However, he provided no rationale for his finding. While a reviewing court must generally afford great deference to the ALJ's credibility determination, it will reverse where the ALJ provides no explanation for it. *Brindisi v. Barnhart*, 315 F.3d 783, 787–88 (7th Cir.2003); *Steele*, 290 F.3d at 941–42; *Zurawski*, 245 F.3d at 887. In evaluating credibility, the ALJ must comply with SSR 96–7p. *Brindisi*, 315 F.3d at 787. Under SSR 96–7p, an ALJ's evaluation of a claimant's credibility must contain "specific reasons" and "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "[I]t is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" SSR 96–7p. That is essentially what the ALJ did here, discounting plaintiff's testimony in a conclusory statement. Thus, for this reason as well, the decision must be reversed.

## C. RFC Determination

■ In determining plaintiff's RFC, the ALJ rejected the findings of Dr. Arain, stating:

While Dr. Arain's medical assessment form is quite restrictive, indicating the need for unscheduled breaks five times during a work shift and limitation due to chronic pain all over the body, the undersigned notes that Exhibit 32–F is based on the claimant's self-reported limitations. Examinations in Exhibit

24. As noted, the ALJ's conclusion that plaintiff did not have fibromyalgia and that her symptoms were not supported medically was flawed.

31–F have shown normal strength, negative straight-leg raising, normal MRI scan of the claimant's back and knees and normal neurological examination. (Tr. at 19.) He then proceeded to reject the diagnosis of fibromyalgia and concluded that plaintiff could "perform simple, unskilled, low stress work with a sit/stand option requiring no overhead work or working around dangerous machinery." (Tr. at 20.)

There are several problems with this determination. First and most importantly, the ALJ rejected the opinion of plaintiff's treating physician without providing good reasons for doing so. As noted, such opinions are accorded special prominence in Social Security cases. *Dominguese,* 172 F.Supp.2d at 1100. The ALJ rejected Dr. Arain's opinion because it was allegedly based on plaintiff's "self-reported limitations." (Tr. at 19.) This was error. As the court noted in *Green–Younger:* "The fact that Dr. Helfand also relied on Green–Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as '[a] patient's report of complaints, or history, is an essential diagnostic tool.'" 335 F.3d at 107 (quoting *Flanery v. Chater,* 112 F.3d 346, 350 (8th Cir. 1997)); *see also* Mary Sue Henipen et al., *Reference Guide on Medical Testimony, in* Federal Judicial Center, *Manual on Scientific Evidence* 452–53 (2d ed.2000) (stating that it is widely accepted that information obtained from the patient is one of the primary and most useful tools in arriving at a conclusion about a patient's condition).[25]

Second, the ALJ failed to cite any medical evidence supporting his RFC finding. One of the Appeals Council's directives to the ALJ when it reversed and remanded

his first decision was to further consider plaintiff's RFC, with specific references to the record. The ALJ again failed to properly support his RFC determination with record citations. *See Clifford,* 227 F.3d at 870 ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.").

Third, the ALJ failed to discuss the factors set forth in 20 C.F.R. § 404.1527 before rejecting Dr. Arain's opinion. *Id.* (holding that failure to give good reasons for rejecting treating physician's opinion will result in reversal).

Fourth, the ALJ ignored the mental RFC factors discussed in the report and records of Paul Barno in determining plaintiff's RFC.[26] Even if a claimant's mental impairment does not meet or equal any of the Listings, the ALJ should consider whether the claimant retains the mental RFC to perform substantial gainful activity. *See Wates v. Barnhart,* 274 F.Supp.2d 1024, 1036 (E.D.Wis.2003) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00; 20 C.F.R. § 404.1520a(c)(3)). In any event, the ALJ may never simply ignore an entire line of evidence that is contrary to his ruling. *Golembiewski,* 322 F.3d at 917.

For all of these reasons, the decision must be reversed on this ground as well.

## V. CONCLUSION

 In her complaint, plaintiff asked that the court find her disabled or, in the alternative, remand for another hearing. Generally, a judicial award of benefits is proper only when all essential factual issues have been resolved and the record clearly establishes that the plaintiff

---

25. In any event, it is not at all clear that this report (Tr. at 629) was based solely on self-report rather than on Dr. Arain's observations over the course of several years of treatment.

26. Barno is not a doctor. Thus, it appears that his opinions would be evaluated under 20 C.F.R. § 404.1513(d).

is entitled to benefits. *See, e.g., Faucher v. Sec'y of Health & Human Services*, 17 F.3d 171, 176 (6th Cir.1994); *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir.1993). However, the court is more apt to judicially award benefits when the matter has been remanded to the ALJ before and the agency has shown itself unwilling or unable to properly adjudicate the application. *See Gotz v. Barnhart*, 207 F.Supp.2d 886, 903 (E.D.Wis.2002).

Judge Gorence recommended that the matter be remanded for further proceedings, and plaintiff did not object to that recommendation. Nevertheless, I am concerned about the length of time that this application has been pending—more than five years—and the fact that plaintiff has been through two administrative hearings already. The ALJ has twice failed to produce a proper decision on her claim. It would thus be within my discretion to award benefits in this case. *See Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir.1998) (awarding benefits where, following remand, ALJ "left the case exactly where it was the last time: with no reasoned basis for the denial of benefits").

However, because it is not the court's role to make disability determinations, and because there remains evidence in the record that the Commissioner has not considered, I will remand the case for further proceedings consistent with this decision. Given the history of the case, I strongly recommend that the Commissioner transfer the matter to a different ALJ. Given the decisions produced, the current ALJ may "have an unshakable commitment to the denial of this applicant's claim." *See Sarchet*, 78 F.3d at 309.

On remand, the ALJ must (1) re-evaluate Dr. Arain's diagnosis of fibromyalgia under the standards set forth herein; (2) re-evaluate the credibility of plaintiff's testimony under the standards set forth herein; and (3) re-evaluate plaintiff's RFC,

properly considering Dr. Arain's opinion and the records and report of Paul Barno, under the standards set forth herein.

**THEREFORE, IT IS ORDERED THAT** Magistrate Judge Gorence's Recommendation is **ADOPTED**, the Commissioner's decision is **REVERSED**, and the case is remanded for further proceedings consistent with this decision pursuant to § 405(g), sentence four.